Gerard **EHRET** and Veronica Donovan, individually and on behalf of their minor child, Margo Ehret, an infant, Plaintiffs,

v.

**NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES, et al.,** Defendants.

No. CV 81–2042.

United States District Court, E.D. New York.

April 19, 1985.

See also 102 F.R.D. 90.

Louise Gruner Gans, Community Action for Legal Services, Inc.

Norman Siegel, MFY Legal Services, New York City, Mark Spires, Queens Legal Services, Long Island City, N.Y., for plaintiffs; Edward N. Simon, New York City, Barbara Finkelstein, Long Island City, N.Y., of counsel.

Frederick A.O. Schwarz, Jr., Corp. Counsel by Louise S. Horowitz and Isaac Klepfish, New York City, for defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

WEXLER, District Judge.

**FINDINGS OF FACT**

Gerard Ehret, Veronica Donovan and their daughter Margo Ehret, who was born on February 4, 1979, lived in the down-

stairs apartment at 39–60 45th Street, Long Island City, New York, on or about March 25, 1980. The apartment they lived in was part of a two story semi-detached home owned jointly by Gerard Ehret and his mother, Noreen Ehret, who lived in the upstairs apartment.

The New York City Department of Social Services (DSS), the defendant, is an agency of the New York City Government. In 1980, the Department of Social Services was empowered to carry out child protective functions in accordance with applicable law. The Department carried out these functions through its division known as Special Services for Children (SCC), which was formerly the Bureau of Child Welfare (BCW). In 1980, the SSC maintained a Field Office at 165–15 Archy Avenue, Jamaica, New York, which handled child protective cases in the borough of Queens.

The defendant Charles Burgess was a Supervisor I of a child protective unit in the Queens Field Office of the SSC, at all relevant times in 1980. He supervised the defendant Addie Grizzel, who was a case worker in the Queens Field Office. She was responsible for carrying out child protective investigations at all relevant times in 1980.

The defendant Joseph Grossman was a Sergeant in the New York City Police Department and was assigned to the 108th Precinct at all relevant times in 1980.

The defendant Police Officers William Seyfried and Georgia Nurse were police officers assigned to the 108th Precinct at all relevant times in 1980.

On the afternoon of March 23, 1980, the Queens Field Office of the SSC received a telecopy from the New York State Central Registry of an anonymous telephone complaint alleging child abuse at the Ehret residence.

The taker of the call recorded the complaint on a DSS–2221 form. The form stated that the "Father becomes extremely agitated frequently due to pill addiction. He slaps infant daughter around and constantly screams and hollers threats to do additional bodily harm to infant by hanging her, throwing her out of the window, etc. Caller stated further that she has summoned police to premises but they fail to respond. It sounds as though this caller may actually be the mother trying to secure help." The DSS–2221 form was marked "third complaint". The DSS–2221 form was then referred to the child protective unit supervised by Charles Burgess at the Queens Field Office. On March 24, 1980, he assigned the case to Addie Grizzel. He instructed her to give the case first priority because it was the third complaint on the family and because the child was very young. The other complaints had been previously deemed "unfounded."

Ms. Grizzel investigated the complaint at her earliest opportunity on the afternoon of March 25, after completing a morning assignment at Family Court. Ms. Grizzel went to the Ehret home arriving at 39–60 45th Street, Sunnyside, Queens at approximately 2:30 p.m. She carried an identification card indicating that she was an employee of DSS. Ms. Grizzel knocked on the door of the Ehret residence and identified herself to the plaintiff Gerard Ehret, who answered the door, as being from the Bureau of Child Welfare. She asked to speak to Veronica Donovan. Before she finished speaking, Mr. Ehret began shouting racial and obscene epithets and warned Ms. Grizzel, a Black social worker, to get away from the house and not to come back.

At approximately 3:00 p.m. Ms. Grizzel telephoned her Supervisor, Charles Burgess, from a phone booth outside a superette. She told Mr. Burgess how Mr. Ehret violently refused to let her speak to Veronica Donovan. She also reported that Mr. Ehret's physical appearance indicated to her that he was high on drugs, intoxicated or at least in an irrational state. She told Mr. Burgess that she was concerned for the immediate safety of the child and in fear of her own safety.

The New York City Family Court has no mechanism or procedure by which BCW workers can telephone the Court in order to obtain an *ex parte* order of removal

pursuant to § 1022 of the Family Court Act. Therefore, Mr. Burgess, with approval of his supervisor, John Schurin, directed Ms. Grizzel to remain on the scene and call for police assistance. They directed her to remove the child from the home unless, upon gaining entry to the home, the circumstances showed that the child was not in fact in imminent danger of serious injury. Mr. Burgess also advised Ms. Grizzel that he was sending two additional workers, Henry Gilchrist and Cynthia Graham, to insure her safety and to assist her in completing her assignment. He told her to wait in the superette until they arrived.

At approximately 4:00 p.m. Mr. Gilchrist and Ms. Graham arrived at the superette where Ms. Grizzel was waiting. After they arrived Ms. Grizzel telephoned 911 and requested police assistance. The 911 operator recorded the following: "4:06 p.m. Child abuse complaint. See female complainant Grizzel in front of location. Male at location intox threaten her. She is trying to check on a baby at the location." Police Officers Seyfried and Georgianni were dispatched in a patrol car to the Ehret residence and arrived there shortly after 4:36 p.m. Ms. Grizzel, who was waiting there for the police, informed the officers that she needed assistance to remove the child inside.

The police officers spoke to Mr. Ehret and asked him to allow Ms. Grizzel to come in the house. Mr. Ehret refused to allow anyone to see the baby or speak to the mother. He continued to shout, using violent language and racial epithets. The police officers at the scene radioed for other back-up units because of Mr. Ehret's irrational conduct and his persistent refusal to permit Ms. Grizzel to see the baby.

Several additional police cars responded to the scene, including a police car operated by Police Officers Georgia Nurse and George Schultz. Officer Schultz recognized the Ehret residence because he was there before when he responded to a family dispute involving violence between the plaintiffs Ehret and Donovan. Officer Schultz also knew of the reputation of Mr. Ehret in the community as being an alcoholic, violent person and a cop fighter. He told the other officers at the scene about Mr. Ehret's reputation.

At approximately 4:54 p.m. the police officers radioed for a sergeant to be dispatched to the location. According to Patrol Guide 106–15, when a situation involves the emergency removal of a child due to imminent danger, a sergeant must be present on the scene. The radio dispatcher also recorded at that time that there was possibly an emotionally disturbed person at the location.

Sergeant Joseph Grossman, responding to the call, arrived at the Ehret home sometime after 5:00 p.m. He also knew of Mr. Ehret's reputation as being a drunk, a cop fighter and a violent person. Ms. Grizzel explained the situation to the sergeant upon his arrival. She told him of the anonymous complaint and of Mr. Ehret's bizarre behavior, and that she was in fear for the child's safety.

Sergeant Grossman's role at this point was to keep the peace and to assist BCW in effectuating its decision to remove the baby. Accordingly, he knocked on the door and tried to persuade Mr. Ehret to admit Ms. Grizzel to see the baby. Mr. Ehret opened the door and admitted Sergeant Grossman, but persisted in his refusal to permit his child to be seen by Ms. Grizzel. He continued to shout and curse. Mr. Ehret declared that he would allow no Blacks in his house.

The police at the scene radioed for an Emergencies Services Unit at 5:24 p.m. The Emergencies Services Unit assist police in dealing with emotionally disturbed persons. Because of Mr. Ehret's conduct, the police at the scene reasonably believed that the assistance of this specialized unit was necessary.

Meanwhile, Sergeant Grossman, failing at his attempts to persuade Mr. Ehret to admit Ms. Grizzel, advised Mr. Ehret that the police were going to enter his home. As the police entered the home, Mr. Ehret sat down on the staircase inside the house and began to cry. Veronica Donovan ran

up the staircase into the upstairs apartment with the baby in her arms and slammed the door. Sergeant Grossman ran up the stairs after Ms. Donovan and kicked the door below the handle causing the door to open. Ms. Grizzel and Officer Nurse followed him up the stairs and into the upstairs apartment, while Officer Georgianni remained outside the Ehret home and Officer Schultz stood downstairs watching Mr. Ehret. While in the room Sergeant Grossman directed Officer Nurse to speak to Ms. Donovan. Both Officer Nurse and Ms. Grizzel tried to persuade Ms. Donovan to relinquish the baby. Ultimately, Ms. Donovan gave the baby to Officer Nurse and asked her to escort her and the baby from the Ehret residence. Ms. Donovan also made a telephone call to her aunt, to whom Ms. Grizzel spoke and explained the situation.

During that time, Mr. Ehret ran upstairs and tried to enter the upstairs apartment. He was cursing and shouting racial slurs. Sergeant Grossman prevented Mr. Ehret from entering the apartment by placing his nightstick in front of Mr. Ehret. Apparently, Mr. Ehret was particularly upset by the fact that Officer Nurse, who was holding the baby, was Black.

Officer Nurse, carrying the baby, Ms. Grizzel and Ms. Donovan left the upstairs apartment and went down the stairs into the Donovan/Ehret apartment to obtain clothing and other items for the baby. They then proceeded to a police car and drove to the precinct station house. No one attempted to prevent Ms. Donovan from entering the police car. At 5:45 p.m. the police at the scene radioed that one female would be transported to the precinct house.

Mr. Ehret ran from the house shouting and cursing, then stood in front of the police car to stop it from leaving. Mr. Ehret spoke to the police officers and told them he wanted to go to the precinct house. He got into another police car and proceeded to the station. At approximately 5:45 p.m., the police radioed that they were transporting someone to the station house.

The police officers did not attempt to run over Mr. Ehret with the police car.

Meanwhile, Officer Nurse, who was still carrying the baby, Ms. Donovan and Ms. Grizzel arrived at the precinct station house. As the three began to talk Mr. Ehret arrived and caused a commotion. Ms. Grizzel and Officer Nurse, who still carried the baby, began to leave the building. Before leaving Ms. Grizzel advised Ms. Donovan that she and Mr. Ehret should be in Family Court in Queens the next day. Ms. Grizzel wrote the address of the Queens Family Court on a piece of paper and gave it to Ms. Donovan.

The baby was taken to a hospital and examined by a resident doctor who found no physical injuries or other outward evidence of abuse or neglect on the baby. However, the resident doctor held the baby at the hospital overnight for observation. The police radio dispatcher recorded "condition corrected" on the incident as of 6:16 p.m.

On the morning of March 26, 1980, Ms. Grizzel went to Family Court in Queens and requested that the Department of Social Services' attorney, Peter Porcasi, draw up a petition for an order remanding the baby to the custody of the Commissioner of Social Services. Peter Porcasi declined to draw up a petition because he believed the Court would not grant a remand order without evidence of physical injury or eyewitness testimony of maltreatment.

That same day before noon Ms. Donovan and Mr. Ehret arrived in Family Court. They were informed that Mr. Porcasi made the decision not to petition for remand. Because of the attorney's decision, Mr. Burgess gave Ms. Donovan authorization to pick up the child at the hospital. Ms. Donovan picked up the child that afternoon at the hospital and took her home.

The Family Court does not now and did not in 1980 have any procedure or make any provision for court orders of removal pursuant to § 1022 of the Family Court Act to be obtained after 5:00 p.m. or by telephone at any time.

Gerard Ehret had a well-established pre-1980 history of treatment for paranoid schizophrenia, and a history of chronic anti-social behavior, of hostility to authority figures, and of alcoholism.

A 1983 psychiatric examination of Gerard Ehret yielded a diagnosis of paranoid personality disorder with sociopathic trends, but no evidence of the post-traumatic stress disorder alleged by plaintiff. Mr. Ehret's psychological condition after March 25 and 26, 1980 did not differ from his earlier condition.

Plaintiff Veronica Donovan has not shown any evidence of psychological injury arising from the events of March 25 to 26, 1980. Nor is there any evidence that the infant Margo Ehret has suffered any psychological injury from the acts of the defendants.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to Title 42 U.S.C. § 1983.

2. All the defendants acted under color of state law.

3. The plaintiffs' right to the privacy and security of their home are guaranteed under the United States Constitution and the New York Constitution.

4. The defendants, acting under color of state law, had no authorization to forcibly enter into a private home without a warrant or court order and the burden of showing that the entry was required and supported by exigent or emergency circumstances is on the individual and municipal defendants.

5. It is well established that the guarantees of the Fourth Amendment against unreasonable search and seizure are not violated when peace officers acting under color of law take action otherwise prohibited in circumstances where it is reasonable to believe that a situation posing imminent harm to persons or property exists. *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). Therefore, the constitutionality of the actions of the individual defendants must be determined by the reasonableness of their actions.

6. The actions of plaintiff Gerard Ehret and the active or passive cooperation and assent to those actions of plaintiff Veronica Donovan were unreasonable, irrational and precipitated the ensuing events. If not for the irrational actions of plaintiff Gerard Ehret, the forcible entry of the Ehret home would never have taken place and it would not have been necessary to remove the child Margo in order to examine her.

7. The actions of the plaintiffs created an emergency as contemplated by Social Services Law § 417 and Family Court Act § 1024.

8. This Court finds that the defendants acted reasonably under the emergency situation created by the plaintiffs, which caused defendant Addie Grizzel to reasonably believe that the infant child Margo Ehret was in imminent danger. The Court further finds that there was not sufficient time to obtain a court order.

9. The entry of the police with the DSS social workers were justifiable actions as they had reasonable grounds to believe that the infant was in imminent danger and were further justified in removing the child to another place for an examination to reasonably determine the condition and safety of the child. Mr. Ehret's threatening behavior and harrassment of the defendants necessitated removal of the child.

10. This Court finds that if there was any wrongdoing it was done by the plaintiffs in their unreasonable and irrational behavior from the first time Ms. Grizzel came to the door until the close of the entire episode. Mr. Ehret was irrational, intoxicated, menacing, and likely to act violently.

11. The Court finds the plaintiff have failed to prove any psychological injury to themselves arising from the defendants' actions.

12. The Court finds that the policies, procedures, and training methods of the municipality have not been brought into

question in this case, as the individual defendants acted reasonably and did not violate the constitutional rights of the plaintiffs.

13. This Court commends the defendants in their professional handling of the entire case and is shocked by the plaintiffs' attorneys' unjustifiable pursuit of a case that presented no legitimate issues.

14. This Court finds the actions of the plaintiffs violated the rights of the Black defendants. No person in our society whether civil servant or private citizen must endure racial slurs. This Court is further shocked that the plaintiffs' attorneys, after knowledge of all the facts from discovery, continued to pursue the baseless claims of a racially prejudiced white who violated the rights of minorities and then asserted his rights under the Constitution.

15. Approximately two years of active and exhaustive discovery was had in this case. There were thorough depositions of parties, witnesses, and experts, in addition to interrogatories and document production. By the close of pre-trial discovery it must have been pellucidly clear to a reasonable and objective mind that the plaintiffs' case lacked practical and substantive merit, and that they had little probability of prevailing at trial. While it is true that the state should not use undue force in investigating child abuse allegations, this case presents no factual context for this principle.

■ 16. Gerard Ehret behaved in a way that defendants' response was reasonable, rational, and perhaps commendable. There is no factual support for the claimed violation of the plaintiffs' constitutional rights. The feebleness of plaintiffs' case was apparent once all the facts were discovered. The matter should not have been taken to trial. Accordingly, an award of costs and disbursements to the defendants is appropriate. *Lane v. Southeby Parke Bernet, Inc.*, 758 F.2d 71 (2d Cir.1985).

This Court finds judgment for the defendants with costs. Defendants will submit affidavits and supporting documentation for the assessment of costs and disbursements against plaintiffs. The Clerk of the Court is hereby directed to enter judgment in favor of defendants. Plaintiffs shall take nothing from defendants.

SO ORDERED.